LOUIS O. BECKER, *Appellant,* vs. ERNEST AMOS, Comptroller of the State of Florida, and E. P. DUNCAN, as liquidator of THE SOUTHERN BANK AND TRUST COMPANY, a Florida corporation, *Appellees.*

141 So. 136.

Division B.

Opinion filed April 19, 1932.

232

*T. E. Price,* for Appellant;
*Hudson & Cason,* for Appellees.

DAVIS, J.—The appellant in this case, by his bill of complaint filed in the court below, alleged that he was a depositor in the Southern Bank and Trust Company on February 6, 1928, upon which date the said Southern Bank and Trust Company closed its doors; that he had on deposit at that time the sum of $3,428.21; that subsequent to the closing thereof he entered into a contract agreeing with the Southern Bank and Trust Company for the re-opening of the bank under certain terms and conditions embraced in this contract, which was attached to the bill of complaint.

The Southern Bank and Trust Company, having been closed by the Comptroller later was reopened in accordance with Chapter 14487, Laws of Florida, Acts of 1929, under a "freezing" agreement accompanied by a 100 per cent. stock assessment. The freezing agreement provided in substance that each depositor should be paid 5 per cent. of his deposit on the reopening of the bank; that each depositor should receive a certificate of deposit payable on or before 42 months after re-opening for 55 per cent. of the deposit; that 40 per cent. of each deposit should be frozen and set aside to the liquidation of "slow and doubtful" paper; and that moneys deposited after the reopening of the bank should not be affected by the *freezing* agreement.

Thereafter, upon re-opening, the bank paid 5 per cent. of each depositor's account in cash. It also issued to each of its depositors a special certificate of deposit for 55 per cent. of his deposit, payable 42 months after date, as well

as a further certificate showing 40 per cent. of his deposit set aside for an indefinite period as "a subordinated demand." At divers times after the bank re-opened, it made payments of dividends on its 55 per cent. deposit agreements which had been made payable in full 42 months after date, so that the aggregate of these dividends so paid on the 55 per cent. deposit agreements amounted to 20.685 per cent. of the total thereof.

Divers depositors, creditors and holders of the 55 per cent. deposit certificates failed to call for their dividend checks which had been made out and kept available for delivery to them, with the result that on September 5, 1931, when the bank closed a second time, the Southern Bank & Trust Company had on hand, and turned over to its liquidator, the sum of $28,221.22 which had been set aside and kept on hand by the bank to provide for the payment of those who held certified checks, cashier's checks, 55 per cent. deposit certificates and other unpaid payable claims against the bank.

On September 9, 1931 the appointment of E. P. Duncan, as Liquidator of the bank after its second closing, was confirmed by the Circuit Court.

Shortly after this, the complainant, taking the position that the $28,221.22 fund above referred to was an asset of the bank which should be prorated for the benefit of all the creditors, and that he as a creditor was entitled to participate therein, filed his bill of complaint against the liquidator and Comptroller, seeking injunctive relief to that end.

By his amended answer, the liquidator proposed a plan of his own for the disbursement of the bank's assets. This plan in substance was as follows: (1) That the liquidator would use the funds in his hands, after paying the expenses of liquidation, for the payment of such claims as were legally proved and established, and which were not

barred by the statutes, in the following order: (2) all un-paid obligations incurred by the bank between its re-opening on April 30, 1928, and its second closing on September 5, 1931, out of the assets acquired by the bank between such re-opening and final closing; (b) the claim of each depositor who had not been paid his 5 per cent. dividend in cash along with other depositors when the bank re-opened, with a like dividend to be paid to those who held cashier's checks and certificates of deposit as creditors of the bank at the time it reopened; (c) that he would equalize dividends on the 55 per cent. 42 months deposit certificates issued under the freezing agreement, by paying to each holder of such certificates not already paid that amount thereon, a sum sufficient to pay 20.865 per cent. of the face of all outstanding certificates of that character; (d) that he would make payment so far as re-maining funds should be available, ratably, on the unpaid balances due depositors on their 55 per cent. certificates. (2) That if any funds remained after making the payments hereinbefore mentioned, that he would make payments, as far as funds should be available, ratably, on all the 40 per cent. "subordinated claim" certificates, which had been issued to depositors under their *freezing* agreement, with the understanding that same should be held as a sub-ordinated claim to be realized out of the liquidation of "slow" and "doubtful" paper.

The Chancellor sustained the contentions of the Comptroller and Liquidator as to the proper method of distribution of the assets and denied the injunction, from which order complainant appealed.

We are of the opinion that the holding of the Circuit Judge was correct, and that the plan of distribution he has approved is in accordance with applicable provisions of law and should be affirmed.

In an able opinion which the Chancellor filed at the time

he denied the injunction and dismissed the complainant's
bill, he said:

"It appears that this is a case wherein the Southern
Bank & Trust Company was a going concern doing a
banking business until 1928, at which time the assets and
affairs of said bank were taken possession of by the
Comptroller of the State of Florida pursuant to statute;
that thereafter pursuant to statute, the depositor-cred-
itors entered into a "freezing" agreement pursuant to
which the assets of said bank were turned back to the
said Southern Bank & Trust Company for resuming
business, acquiring assets and incurring new obligations,
and in doing a regular banking business; that thereafter
in the month of September, 1931, the Comptroller again
took possession of the assets of the said Southern Bank
& Trust Company for the benefit of administration of
said estate for the benefit of the creditors of the said
bank.

"It is apparent that after the Comptroller took pos-
session of the 'bank' that he thereafter surrendered
possession of it pursuant to Chapter 11849, of the laws
of Florida, 1927, which provides that after the Comp-
troller has taken possession of the bank because of its
condition, etc., that he may:

'upon conditions as may be approved by him, sur-
render possession of such bank for the purpose of
permitting such bank . . to resume business . . .

and further provides:

'that upon the petition and consent in writing of the
representatives of an amount of the deposits of any
such bank, banking company or banker, aggregating
seventy-five per centum or more of the total deposits
of such bank, banking company or banker, the Comp-
troller shall by order freeze all deposits of such bank,
banking company or banker upon such reasonable
terms and conditions as he may fix, as one of the
terms of such resumption of business . . . '

\* \* \* \* \* \* \*

"The Act is subject to (the) construction, that the
assets of said bank as of the time of 'freezing' are assets
held by the Comptroller for the benefit of the creditors
of said bank, who thereupon become and are the *cestui*

*que* trustents; that the Comptroller as trustee has the
option of administering said trust fund for the benefit
of the beneficiaries, himself through his liquidator, or
might surrender the bank upon conditions as might be
approved by him, and in the event petition and consent
in writing of tho'se persons representing 75% of the total
depositors of said bank, should order all deposits frozen
upon such terms and conditions as he may fix; there-
upon, instead of he, the Comptroller, the bank itself
would become the administrator of said trust estate, with
its clear duties as such, and upon the bank re-opening,
then of course the new and subsequent creditors become
such, with the right that they, the new creditors or de-
positors, will not be involved in anywise with said bank
except in its new status, and with the right to look to
the new assets as security for the new obligations, and
free of the hazard of their new depo'sits being con-
founded and commingled with the old deposits, and with
the clear right that, in case of default, the new de-
positors will have the right to look to the stockholders'
liabilities with assessments in case such becomes neces-
sary; that the old assets of the old creditors shall be
considered as a separate and distinct estate with its bene-
ficiaries, and that the banking business thereafter shall
be considered separate and distinct and apart from and
with a clear line of demarcation between the two sets
of creditors and the two sets of assets.

"I am of the opinion that the . . . foregoing construc-
tion is the correct one in this case and in those cases
wherein a 'freezing' agreement and re-opening occurred
pursuant thereto, but that such might not be the law
when there was no 'freezing' agreement, and the bank
was surrendered pursuant to the first proviso of the
act, to-wit: Chapter 11849, Laws of Florida, 1927.

"It further appearing unto the Court that in and by
said answer the said defendant (Comptroller and Li-
quidator) proposes to disburse said funds in conformity
with the foregoing findings of law and that there is no
occasion for said injunction, it is thereupon

"Considered, ordered, adjudged and decreed that the
relief in and by said bill sought should be denied . . . .
and that the defendant disburse said funds in conformity

with the proposed plan of disbursement as set forth in said amended answer.''

"DONE AND DECREED in Chambers, at Miami, Florida, this 3rd day of November, A. D. 1931.

PAUL D. BARNS,
Circuit Judge.''

Chapter 11849, Laws of Florida, Acts of 1927, was amended by Chapter 14497, Laws of Florida, Acts of 1929. Both appear as section 6108, Compiled General Laws, 1927 (Section 4167, Rev. Gen. Stats. 1920, as amended). Section 24 of Chapter 13576, Acts 1929, was an amendment itself of Chapter 11849, Acts of 1927, but this statute was later superseded by Chapter 14497, Acts of the 1929 Special Session, which appears as Section 6108, C. G. L. 1930 Supplement.

Both the original statute and its several amendments have been heretofore considered by this Court. See Amos vs. Conkling, 99 Fla. 206, 126 Sou. Rep. 283; McConville v. Fort Pierce Bank & Trust Company, 101 Fla. 727, 135 Sou. Rep. 392. Their history and the purpose of their enactment is well known, and their validity has been attacked and sustained by both the state and Federal courts in this jurisdiction.*

Here it appears that the Southern Bank & Trust Company had already closed its doors and been taken charge of by the Comptroller. This contingency required one of

---

*The Florida statute authorizing banks to resume business under *freezing* agreements with a stated percentage of depositors, was the outgrowth of a condition which followed the collapse of the Florida real estate "boom." Many banks were left with assets of considerable ordinary value, but which were "frozen" in so far as banking purposes were concerned. Such banks were in fact solvent, because their assets greatly exceeded their liabilities. At the same time, the assets were not liquid, in that they could not be easily and readily discounted or sold to raise cash to meet unexpected demands from withdrawing depositors who were gradually withdrawing their funds and leaving the state after the boom. Realizing that to require the closing and dissolution of such banks, and their ultimate liquidation, would result in great losses to many communities which would thereby be deprived of banking facilities, the Legislature passed the statute providing that in special instances, with the approval of the Comptroller, a bank might resume business and act as its own liquidator while carrying on a new and separate banking business at its old banking house.

three possible courses to be taken for the benefit of its then creditors: (1) retained in the possession of the Comptroller until its affairs were placed in sound and safe condition for re-opening; (2) turned over to a liquidator to be liquidated and its affairs wound up; (3) surrendered by the Comptroller for the purpose of permitting such bank to resume business under a "freezing" agreement of 75 per cent. of its depositors, approved by the Comptroller.

In the present case such a "freezing" agreement was executed by the required statutory number of the depositors, and approved by the Comptroller. Without such an agreement, the bank would have remained permanently closed, its business wound up and its assets liquidated and distributed pro rata among its creditors through the procedure provided by law. That it. was allowed to re-open and resume its business in an effort to pay complainant and others similarly situated, is the consequence of their own assent, given in statutory form, to the agreement for "freezing" its debts for a sufficient length of time to allow it to dispose of them in an orderly way, and not at forced sale as would have been the case otherwise.

The lower Court, in its decree, took the position that the execution of the *freezing* agreement became a contract by which all of the bank's creditors were bound to the particular method of distribution thereby provided; that to effectuate it the bank became a trustee of its own assets for the benefit of its creditors at the time it first closed, and that it did not re-acquire its former assets in its own right or as its own property, bound only by the contractual obligations embraced in the freezing agreement, as contended by appellant.

The Chancellor was further of the opinion that the purpose of the "freezing" statute was more than to provide a temporary expedient to allow the bank to resume its business without having to pay its depositors on demand,—

that on the contrary it was to provide a way for permanent adjustment of the rights of the parties both as among themselves and toward the bank, after it re-opened, so as to make the bank a trustee for its own creditors with reference to the assets which should be re-delivered to it by the Comptroller, and to require it to administer its trust and account as a trustee for such administration. He further held that in the nature of things, the new business and assets of the bank were in nowise to be obligated for its former debts, and that as to the new depositors, the bank was to all intents and purposes a new bank with regard to its new assets.

Opposed to this the appellant argues that no such trust relationship is created; that the bank is a simple debtor on its certificates of deposit of whatever character and that no former depositor of the bank could have prevented the bank from expending the money coming into its possession in the course of liquidation, for any legitimate business purpose of the bank; that there is nothing in such a "freezing" agreement or in the statute, which would compel the bank to segregate, set aside, or hold separate any of the funds received by the bank for the use or benefit of any holder of its certificates of deposit issued when the freezing agreement was executed; that the re-opening of the bank is no more than the continuance of the former bank, there being neither new capital, new stock, new directors, nor any other fact which would legally change the status of its depositors when it first closed, and that upon its re-opening, that all new depositors assume toward the bank the same relation as those who were depositors when it closed, and have no greater rights than they have in the distribution of its assets.

The construction contended for by the appellant would defeat the only useful purpose the statute was intended to serve, while that placed upon it by the Circuit Judge is

both reasonable, and such as comports with the established rule, that remedial statutes are to be construed so as to advance the remedy intended. Amos vs. Conkling, supra. We therefore adopt the construction suggested by the Circuit Judge and reject that contended for by the appellant here.

When a closed bank has been duly re-opened under a *freezing* agreement, as authorized by Section 6108, C. G. L. 4167 R. G. S., as amended, and has later been again closed and placed in the hands of a liquidator, such liquidator is required to observe and carry out the terms of the *freezing* agreement under which the bank was re-opened and resumed business.

And in such situation, the liquidator, is further required to make a distinction between those depositors who have deposited in the bank *after* the bank was re-opened under the *freezing* agreement and its former depositors, by paying in full the claims of the new depositors out of its new funds and assets, before allowing the old depositors to participate therein. It is the purpose of the law allowing the re-opening of banks under ''freezing'' agreements with its old depositors, that those who become new depositors of the bank after it is allowed to resume business, shall have preferential payment out of all *new* moneys and assets brought into its business after it is re-opened, before others also having claims against the bank are allowed to participate therein.

The closing of the bank in the first instance fixed the rights of its then depositors to a ratable distribution of its then existing assets, as provided by law for the liquidation and winding up of insolvent banks. The purpose of the statute permitting the Comptroller to allow the bank to re-open and resume its banking business under a ''freezing'' agreement with its depositors having claims against it when it first closed, was to use the medium of the re-

opened bank for the liquidation and paying out of its liabilities under the ''freezing'' agreement. This in effect authorizes the bank to inaugurate a new and entirely separate and distinct banking business with its customers who should deal with it after it was allowed to re-open under such an agreement, and indeed the statute itself contemplates that such new business and the funds and assets involved therein shall at all times be kept separate and segregated from all connection with its former affairs.

Since the bank became a trustee of the assets re-delivered to it by the Comptroller when he allowed it to re-open, and was charged with the duty of administering such assets for the benefit of those who had permitted the bank to re-open through the ''freezing'' agreement by which they became bound, it was not only the right, but the duty, of the liquidator of such trustee bank when it closed the second time, to execute the trust chargeable against any assets of the old bank coming into his hands, and to carry out the terms of the ''freezing'' agreement with each depositor having rights thereunder. Tomasello v. Murphy, 100 Fla. 132, 129 Sou. 328. And while the certificates of indebtedness given to each former depositor to represent his claim against the bank under the freezing agreement was a promise to pay made by the bank and enforceable against it as any other promise, it was also a promise to pay *secured by a trust on the former assets of the bank* which were delivered back to it by the Comptroller when it was permitted to resume business.

Furthermore, while it may appear from the bill and answer that the sum of $28,221.22 now in controversy was held by the bank from April 30, 1928, the date of its re-opening, until some time in September, 1930, in the general assets of the re-opened bank, no segregation having taken place prior to that time, that fact did not, and could not, destroy the trust character of those funds, nor defeat the

identification thereof as such, after the segregation was finally and in terms made.

It also appears that upon the first closing of the bank there were outstanding certain cashier's checks and certificates of deposit theretofore issued by the Southern Bank & Trust Company. These had never been presented for collection, and at the time of the decree in the court below, were still outstanding. The liquidator treated the holders of such checks and certificates as creditors of the bank who, under the freezing arrangement, stood upon the same footing as depositors, and took the position that as common creditors they were entitled to the same rights and dividends out of the former assets as those to which depositors under that arrangement were entitled.

Since it would have been the duty of the Comptroller, in the absence of special circumstances, in administering the affairs of the bank had it been closed and wound up as an insolvent institution, to have treated these claims as being in like status to those of the other common creditors, including the depositors, and since the re-opening of the bank under the *freezing* arrangement was in legal effect the functioning of the bank as its own liquidator toward its old banking business, there was no error in the court's approval of such plan of distribution by the liquidator.

In the instant case there was a "freezing" agreement binding on all the depositors, under the rule laid down by this Court in McConville v. Fort Pierce Bank & Trust Company, *supra.* Under the terms of that agreement, no depositor was entitled to any preference or advantage over another depositor similarly bound by it, and the Court was quite right in so deciding.

The effect of the liquidator's plan is to equalize all payment out of the proceeds of former assets, so that all the depositors and other creditors shall ultimately receive the same proportionate share of their respective deposits, and

thereafter to continue to pay all of them in accordance with the "freezing" agreement, ratably with each other.

The complainant accepted his proportionate share of the past benefits of the agreement to "freeze" the deposits of the bank and allow it to re-open, and admits by his bill having been paid according to that agreement, all that was by the terms of that agreement properly payable to him when he instituted his suit. Therefore, in that situation he is not now in a position to complain or to have an injunction granted to him which will have the effect, if carried out as complainant contends, of permitting him to receive more than was contemplated to be distributed to the other similarly situated depositors and creditors.

The injunction was therefore properly denied and the decree refusing the relief prayed for and ordering a distribution of the assets in accordance with the plan set up in the Liquidator's amended answer, must be affirmed.

Affirmed.

WHITFIELD, P.J. AND TERRELL, J., concur.

BUFORD, C.J. AND ELLIS AND BROWN, J.J., concur in the opinion and judgment.