902 So.2d 296 (2005)
Melvin BLANKFELD, Personal Representative of the Estate of Riva Blankfeld, Appellant,
v.
RICHMOND HEALTH CARE, INC., d/b/a Sunrise Health and Rehabilitation Center, Appellee.
No. 4D03-4929.
District Court of Appeal of Florida, Fourth District.
May 25, 2005.
*297 Charles P. Schropp of Schropp, Buell & Elligett, P.A., Tampa, and Robert E. Sharbaugh of Law Office of Robert E. Sharbaugh, P.A., St. Petersburg, for appellant.
Leonard Blumenthal and Daniel J. Koleos of Koleos, Rosenberg, Metzger & Doyle, P.A., Fort Lauderdale, for appellee.
EN BANC
PER CURIAM.
Melvin Blankfeld, as Personal Representative of the Estate of Riva Blankfeld, appeals the trial court's decision granting Richmond Health Care's motion to compel arbitration. We reverse because the arbitration procedure substantially limits the remedies created by the Nursing Home Residents Act, and is void as contrary to public policy. We are considering this case en banc to clarify that holding a contractual provision void as contrary to public policy is distinct from holding that a contract is unenforceable because it is unconscionable. We have also concluded that the statutory health care proxy did not have the authority to bind the nursing home patient to arbitrate claims.
In 2001 Riva Blankfeld, who was senile, was readmitted to Sunrise Health and Rehabilitation Center, a nursing home facility, and the admission agreement, which was signed by her son, provided that all disputes "shall be resolved by binding arbitration administered by the National Health Lawyers Association." This suit against the nursing home was filed while Riva was still alive, and after her death, her son Melvin, as personal representative, maintained it, asserting that Sunrise had violated Riva's statutory rights under section 400.022, Florida Statutes (2001). In a separate count, it was alleged that Sunrise had negligently cared for Riva. Sunrise moved to compel arbitration, but Melvin contended that the arbitration provisions were unenforceable. After an evidentiary hearing in which testimony was given as to the circumstances surrounding the execution of the agreements, the court granted Sunrise's motion to compel arbitration.
We first address Melvin's argument that the method of arbitration, which is by the National Health Lawyers Association, limits the remedies created by the legislature in the Nursing Home Residents Act and is therefore void as contrary to public policy.
The arbitration provision provides that "any action, dispute, claim, or controversy of any kind ... now existing or hereafter arising between the parties ... shall be resolved by binding arbitration administered by the National Health Lawyers Association." Section 606 of the NHLA Rules [now known as the American Health *298 Lawyers Association Arbitration Rules of Procedure] provides in part:
[T]he arbitrator may not award consequential, exemplary, incidental, punitive or special damages against a party unless the arbitrator determines, based on the record, that there is clear and convincing evidence that the party against whom such damages are awarded is guilty of conduct evincing an intentional or reckless disregard for the rights of another party or fraud, actual, or presumed.
Requiring clear and convincing evidence of intentional or reckless misconduct effectively eliminates recovery for negligence, and is contrary to the Nursing Home Residents Act, which provides in section 400.023(2):
In any claim brought pursuant to this part alleging a violation of resident's rights or negligence causing injury to or the death of a resident, the claimant shall have the burden of proving, by a preponderance of the evidence, that:
(a) The defendant owed a duty to the resident;
(b) The defendant breached the duty to the resident;
(c) The breach of the duty is a legal cause of loss, injury, death, or damage to the resident; and
(d) The resident sustained loss, injury, death, or damage as a result of the breach.
§ 400.023(2)(a)-(d), Fla. Stat. (2001). Melvin argues that the statute is remedial, is declarative of public policy, and that the limitation on the statutory remedies is therefore void.
A remedial statute is one which confers or changes a remedy. Campus Communs., Inc. v. Earnhardt, 821 So.2d 388 (Fla. 5th DCA 2002). The Nursing Home Resident's Act is remedial. Knowles v. Beverly Enterprises-Florida, Inc., 898 So.2d 1 (Fla.2004). The "Residents Rights" provisions in section 400.022 were enacted in 1980 to respond to a Dade County Grand Jury investigation of nursing homes which revealed detailed evidence of substantial elder abuse occurring in nursing homes. See Romano v. Manor Care, 861 So.2d 59, 62-63 (Fla. 4th DCA 2003); Crotts & Martinez, The Nursing Home Residents' Rights Act-A Good Idea Gone Bad!, 26 STETSON L.REV. 599 (1996). In 1993, the Legislature amended the statute by enacting section 400.023 ("Civil Enforcement"), providing civil remedies for nursing home residents for violation of the statute. § 400.023(1), Fla. Stat. (2001). A cause of action "may be brought in any court of competent jurisdiction to enforce such rights and to recover actual and punitive damages for any violation of the rights of a resident or for negligence." Id.
If nursing home residents had to arbitrate under the NHLA rules, some of the remedies provided in the legislation for negligence would be substantially affected and, for all intents and purposes, eliminated. The provision requiring arbitration under those rules is accordingly contrary to the public policy behind the statute and therefore void. Mullis v. State Farm Mut. Auto. Ins. Co., 252 So.2d 229, 235 (Fla.1971) (insurance policy provision limiting uninsured motorist protection provided in statute held void as contrary to public policy); Holt v. O'Brien Imps. of Fort Myers, Inc., 862 So.2d 87 (Fla. 2d DCA 2003) (automobile purchase contract providing for arbitration which limited remedies provided by Florida Deceptive and Unfair Trade Practices Act held void as contrary to public policy); see also Green v. Life & Health of America, 704 So.2d 1386, 1390 (Fla.1998) (parties can contract around state or federal law except where *299 such a contract provision would be void as contrary to public policy).[1]
In Romano v. Manor Care, 861 So.2d 59 (Fla. 4th DCA 2003), we held that an arbitration agreement in a nursing home contract, which limited non-economic damages to $250,000, and excluded punitive damages, was unenforceable as a matter of law, because it defeated the remedial provisions of the statute protecting nursing home residents. We went on to state, based on Powertel, Inc. v. Bexley, 743 So.2d 570 (Fla. 1st DCA 1999), that the deprivation of the statutory remedy made the arbitration provision substantively unconscionable.
Unconscionability, which can be either procedural or substantive, was explained in Powertel:
The procedural component of unconscionability relates to the manner in which the contract was entered and it involves consideration of such issues as the relative bargaining power of the parties and their ability to know and understand the disputed contract terms. For example, the court might find that a contract is procedurally unconscionable if important terms were "hidden in a maze of fine print and minimized by deceptive sales practices." In contrast, the substantive component focuses on the agreement itself. [A] case is made out for substantive unconscionability by showing that "the terms of the contract are unreasonable and unfair."
743 So.2d at 574. In Romano, Richmond Healthcare, Inc. v. Digati, 878 So.2d 388 (Fla. 4th DCA 2004), Bellsouth Mobility, LLC v. Christopher, 819 So.2d 171 (Fla. 4th DCA 2002), and Chapman v. King Motor, 833 So.2d 820 (Fla. 4th DCA 2002), all cases involving remedial statutes, we engaged in an unconscionability analysis. We now clarify that holding a contractual provision unenforceable because it defeats the remedial provisions of a statute, and is thus contrary to public policy, is distinct from finding unconscionability.[2]
The nursing home argues that if the rules provided for arbitration are unenforceable, we should sever that portion of the arbitration provision providing for arbitration to be administered by the NHLA, but otherwise uphold arbitration. We need not address severability because of our conclusion in the next part of this opinion that the proxy could not bind the nursing home patient to arbitration.
The readmission agreement signed in 2001, which was required by the nursing home, was signed by Melvin. His authority to sign the contract was, at best, as a health care proxy under section 765.401, Florida Statutes (2001). Riva had been *300 previously found, by physicians who had examined her, to be incompetent because of senile dementia.[3]
Section 765.401, Florida Statutes (2001), entitled "Absence of advanced directive," provides that if an incapacitated or developmentally disabled patient has not executed an advanced directive regarding health care, see section 765.101(1), or designated a surrogate, see section 765.101(16), health care decisions may be made by a designated list of individuals which run the gamut from judicially appointed guardians through relatives, friends, and licensed clinical social workers. Section 765.401 specifies that a proxy is authorized to make only "health care decisions." Section 765.101(5) defines them as follows:
`Health care decision' means:
(a) Informed consent, refusal of consent, or withdrawal of consent to any and all health care, including life-prolonging procedures.
(b) The decision to apply for private, public, government, or veterans' benefits to defray the cost of health care.
(c) The right of access to all records of the principal reasonably necessary for a health care surrogate to make decisions involving health care and to apply for benefits.
(d) The decision to make an anatomical gift pursuant to part X of chapter 732.
Section 765.106, provides:
"The provisions of this chapter are cumulative to the existing law regarding an individual's right to consent, or refuse to consent, to medical treatment and do not impair any existing rights or responsibilities which ... a patient, including a ... competent or incompetent person ... may have under the common law, Federal Constitution, State Constitution, or statutes of this state."
One of the provisions of the Act provides that individuals can bring actions to enforce violations of the Act "in any court of competent jurisdiction." § 400.023(1). Melvin, as personal representative, asserts that waiving the right to sue for damages in the courts for violations of the Act or common law negligence is not a health care decision. We agree.
The statutory context demonstrates why a health care proxy was never intended to make such a decision. Under the statutory scheme, because of the loss of mental faculties, the patient is not able to choose or select the proxy for herself. The proxy is called upon to act only because the patient is "incapacitated or developmentally disabled" and cannot do so for herself. § 765.401(1). Also, the proxy is needed because there is no guardian or health care surrogate for the patient. Id. And so the proxy is a last and limited resort whose purpose is simply to consent to heath care services that the patient herself would likely choose if able to do so.
*301 In the present case the health care proxy happens to be the same person who, as personal representative, is now asserting that in his earlier capacity he could not waive arbitration, but that will not always be the case. Even a social worker who is a stranger can be a proxy under section 765.401. There is nothing in the statute to indicate legislative intent that such a proxy can enter into contracts which agree to things not strictly related to health care decisions. In our opinion, a proxy is not authorized to waive the right to trial by jury, to waive common law remedies, or to agree to modify statutory duties applicable generally to all persons receiving health care services.
Reversed.
GUNTHER, STONE, WARNER, POLEN, KLEIN, STEVENSON, SHAHOOD, GROSS, TAYLOR, HAZOURI and MAY, JJ., concur.
FARMER, C.J., concurs specially with opinion.
I concur with the court's holding that a health care proxy is not authorized to agree to arbitration of a patient's claim against a nursing home under section 400.23. I want to add a few words to the court's rationale and voice my divergence from the court's other holding.
If a nursing home wants to deal with someone competent to make such decisions, it has the right to seek the appointment of a guardian.[4] For only a court appointed guardian could waive or compromise property rights, such as civil remedies in negligence or the right to trial by jury.
To suppose that section 765.401 empowers mere proxies to enter into contracts to waive property-related rights is to believe that the legislature sought to give neighbors or social workers authority to act as virtual guardians  but without the protection of having a court determine the necessity therefor and appoint who should act in that capacity. Nothing in the entire chapter suggests a purpose to empower health care proxies to do anything more than consent to a medical modality recommended by the health care provider for an incompetent patient.
One may rightly ask, under what theory could the legislature validly empower someone handpicked by a provider to waive the right to a jury or to substitute a private set of rules to decide a statutory claim for damages? The health care provider has different interests, which might even become antagonistic to the patient. It would be unprecedented to allow someone who may have adversarial interests dealing at arms length to make such personal decisions for someone. Reading such an intent into chapter 765 needlessly introduces enormous constitutional doubts about this important statutory scheme.
Another provision of chapter 765 adds a special protection for the incompetent patient with whom the nursing home wants such an agreement. Section 765.401(2) requires all proxy health care decisions to be an informed consent. § 765.401(2), Fla. *302 Stat. (2004) ("Any health care decision made under this part must be based on the proxy's informed consent [e.s.] and on the decision the proxy reasonably believes the patient would have made under the circumstances."). If arbitration is within the statutory definition of health care services, its validity depends on giving the proxy sufficient information to determine whether the patient would so agree.
We are left with only two possible outcomes under informed consent. If arbitration provisions are included in the definition of health care services, they are subject to the informed consent requirement. If they are not included, a proxy is not authorized to agree to arbitration. Either way, this proxy's assent to arbitration in the admission contracts is ineffective.
Here the nursing home made no attempt to inform any consent to arbitration. It did not call the provision to the proxy's attention or explain the outcome and alternatives. Nor did the nursing home explain that the administration of arbitration by the NHLA would require the claim be decided under substantive rules developed by that organization modifying Florida statutory and common law. At no point did the nursing home convey to the proxy that the contractual term administered[5] meant that the rules of the NHLA were actually being adopted to decide any claim the patient might bring against the nursing home. Instead of informing the consent, the nursing home presented the admission form on the basis of take-it-or-leave-it.
The notion that informed consent applies to arbitration provisions and choice of law rules embedded within health care agreements is not antagonistic to arbitration. See Roe v. Amica Mut. Ins. Co., 533 So.2d 279 (Fla.1988) (arbitration is favored means of dispute resolution and courts indulge every reasonable presumption to uphold proceedings resulting in award); KFC Nat. Mgt. Co. v. Beauregard, 739 So.2d 630 (Fla. 5th DCA 1999) (public policy favors arbitration as an efficient means of settling disputes, because it avoids the delays and expenses of litigation). Requiring informed consent for a proxy to agree to arbitration simply recognizes the law's strong preference for personal autonomy in making such personal decisions.
I note that federal regulations forbid mandatory arbitration provisions in health care contracts covered by ERISA.[6] While Florida law does not prohibit mandatory arbitration provisions in any class of contracts, *303 it does require that all contracts for the provision of health care services be informed in the sense that the provider has an affirmative duty to inform the patient of all aspects affecting such services. See § 765.401(2) ("Any health care decision made under this part must be based on the proxy's informed consent" [e.s.]); see also § 765.101(5)(a) ("`Health care decision' means ... informed consent, refusal of consent, or withdrawal of consent to any and all health care, including life-prolonging procedures.").
I do part company with the court's other holding that the arbitration is against public policy. The public policy decision turns on the notion that the nursing home statute is remedial. The decisions involving the remedial canon point in diverse interpretive directions. In my view, reading a statute as remedial has little real meaning.
First I should make clear that I would refuse to enforce the arbitration agreement because it is absurd to allow nursing homes to escape chapter 400 regulation by consensual arbitration under rules weakening or modifying those statutes. It is absurd to think that a regulatory scheme can be evaded by private contracts of the very person being controlled. It is absurd that an entire industry escape regulation by simply embedding choice of governing substantive law clauses in its contracts. What other police power regulation can be side-stepped by contracts eliminating it? Common carriers evading safety laws by form contracts for passage? Restaurants avoiding health codes by contractual provisions in the bill? Cigarette dealers canceling health warnings by provisions in the sales papers? Home builders modifying building codes in contracts for construction?
As for the court's analysis, Knowles v. Beverly Enterprises-Florida, Inc., 898 So.2d 1 (Fla.2004), is a curious basis to rely on the remedial canon. Knowles refers to it but rejects any liberality in construction and turns instead to plain meaning. Id. ("it is apparent that such an interpretation would alter the clear and unambiguous language of section 400.023(1) by either injecting a different circumstance upon which suit may be brought or by ignoring the language expressly used in the statute."). Knowles directly involves the very same statutes at issue in this case, the nursing home code. Today's decision could be in conflict with Knowles, 898 So.2d at 7 ("while petitioner is correct that section 400.023(1) should be liberally construed, such construction does not mean that this Court may ... ignore the words chosen by the Legislature so as to expand its terms."). It is striking to hang a decision on authority directly conflicting with the outcome  especially when it involves the same statute.
There are many instances in which the supreme court has qualified the remedial canon.[7] Sometimes the canon may mean *304 an expansive interpretation, but it may not. Along with those decisions, there is another body of supreme court decisions referring to remedial statutes as procedural.[8] In some the fact that the statute is both remedial and procedural may lead to special treatment, but it may not. There is yet a third body of opinions referring to remedial statutes, but this time only to distinguish them from penal statutes.[9] The fact that a remedial statute is penal may mean something, but it may not.
All these variations on remedial rob the canon of any real interpretive weight. The fact that one statute is remedial never leads to annulling another. Because all civil statutes are remedial in one sense or another, the cases really suggest that reliance on the remedial canon is little more than a subjective rationalization for a particular outcome, a post hoc justification.
The canon's actual meaning is found in its origins. It was born when the common law was the primary source of social ordering. Most rule-making was by the common law. Statutes filled gaps or addressed conflicts untouched by the common law. Judges used statutes warily because they were few and judges were not accustomed to them.
Early interpretation was limited to these questions: "What was the mischief and defect for which the Common Law did not provide; [and] What remedy the Parliament hath resolved and appointed to cure the disease of the commonwealth ..." Heydon's Case, 76 Eng. Rep. 637 (Ex. 1584). The function of judges was "to *305 make such construction as shall suppress the mischief and advance the remedy ..." Id. These two guides emerged: the remedial canon, and the derogation canon against implied repeals of the common law. The derogation canon would be used for a statute changing the common law, while the remedial canon carried out the holding in Heydon's Case.
Statutes then were not created from common law methodology. Indeed, 18th century judges felt them rather subject to tyrannical majorities and shifting whims. England had suffered through the civil wars of the Seventeenth Century and the abuses of unchecked majorities in Parliament. The beheading of Charles I was followed by the post-restoration instability leading to the Glorious Revolution in 1685. They viewed the common law as a source of social stability, cast from the wisdom of the ages and forged in cases evolving over the long sweep of history. Statutes often emerged from ephemeral, narrow and parochial interests, but the common law was eternal and universal.
In this country, the Progressive Movement at the turn of the 19th into the 20th Century, the legal upheavals resulting from the 20th Century's two World Wars, the Great Depression and the Civil Rights Movement, all had a profound effect on the sources of law. Statutes have assumed a much greater role in making legal and social policy. Indeed statutes have displaced the common law in most areas of American life. Nevertheless our rules for reading them are filled with relies of the English monarchy, and the remedial canon is one of them.
Some in the Academy think the remedial canon was effectively killed by the legal realists.[10] Karl Llewellyn prominently demonstrated that each canon was offset by a contrary canon, that the derogation canon nullified the remedial canon.[11] If the substantive canons feed on one another, how is the judge to use them sensibly? Some judges have thus been critical of the use of the substantive canons.[12] In Florida perhaps the only sense of being remedial is suggested in one early case:

*306 "The sole authority of the Legislature to make laws is the foundation of the principle that courts of justice are bound to give effect to its intention. When that is plain and palpable they must follow it implicitly. The rules of construction with which the books abound apply only where the words used are of doubtful import; they are only so many lights to assist the courts in arriving with more accuracy at the true interpretation of the intention. This is true whether the statute be public or private, general or special, remedial or penal." [e.s.]
Van Pelt v. Hilliard, 75 Fla. 792, 78 So. 693, 695 (1918). Interpretive guides are really only tools to find meaning and purpose in statutory texts. With multiple statutory schemes a broad construction of one at the expense of the other may defeat legislative goals for both.[13]
The issue of arbitration is the heart of our case, and this alternative method of dispute resolution is itself the subject of an entire chapter of the Florida Statutes. See Ch. 682, Fla. Stat. (2004) ("Florida Arbitration Code"). It provides that arbitration provisions are "valid, enforceable, and irrevocable without regard to the justiciable character of the controversy." § 682.02, Fla. Stat. (2004). Our supreme court has even said that arbitration is a "favored" means of dispute resolution.[14] I fear the court leaves the impression that the only favored statutes involved in this case are in the nursing home code.
Truth be told, here the two statutory schemes are in direct conflict. The nursing home code creates rights and remedies; the arbitration code creates rights and remedies. Neither mentions the other. We have only the rule that we must harmonize them if possible. Knowles, 898 So.2d at 8 ("where it is possible, courts must give full effect to all statutory provisions and construe related statutory provisions in harmony with one another."). It is not easy to harmonize conflicting statutes if one is not even acknowledged.
If the clash of statutes is to be solved by the remedial canon, then they are fighting each other with the same borrowed weapon. Both are remedial. The arbitration code because it creates new rights and remedies, a statutory right for the enforcement of arbitration agreements, to which the courts had previously been hostile.[15] Wielding the remedial canon to settle the conflict leaves us in hopeless stalemate.
*307 Both codes start on equal footing; neither suggests one is superior. No supreme court case holds that in spite of section 682.02 the courts can refuse arbitration as against public policy simply because arbitration would not enforce other statutory remedies as a court would. We must give each effect. We must acknowledge the right to enforce valid arbitration agreements. We must work out how they coexist.
In the end, it seems to me that enforcing arbitration over the patient's rights under the nursing home code allows the former to displace the latter. Without a contrary statutory provision, these rights of the patients are supposed to be on the same footing as the right to arbitrate. How does the right to arbitrate end up canceling the nursing home code? Nothing textual supports this. The court offers the remedial canon, but it lacks any content or logic to make either the silent master of the other.
Yet there is a theory with whichfor nowone might give slight way to the other. Nursing homes are now inevitable in people's lives.[16] In fact a nursing home arbitration provision has recently shown up in all the District Courts of Appeal.[17] We can deduce that a form arbitration provision is now becoming routine throughout Florida. Indeed, the testimony below is that it was prepared for that very purpose. The effect of such usage may be the utter displacement of the nursing *308 home code by private agreement. Most Florida patients intended to be safeguarded by the code will not receive any of these prescribed protections.
If the attempt at harmony yields only the utter negation of one, maybe the result is absurd. Another ancient canon, the "golden rule" of statutory construction, has been used in Floridaif not by that name.[18] Because the goal is to give as much effect to the two schemes, the power to interpret statutes to avoid absurdity is not designed for courts to negate one statute in favor of another.[19] The absurdity canon does not empower judges to void contracts simply because an individual has waived statutory rights.[20] After all, there is a strong public policy valuing the right of personal autonomy in matters of contract.[21] The absurdity principle must be applied with restraint. It serves only to prevent truly absurd results unwittingly generated by a given application of a statute.
When a statute is found to lead to absurd results, its provisions being annulled by another statute, preferably the court applies a "clear statement" holding. As one court explained: "[i]n traditionally sensitive areas ... the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." United *309 States v. Bass, 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). One well known scholar has said that "the Anglo-American legal tradition has employed clear statement rules for as long as it has done statutory interpretation." William N. Eskridge, Jr., Public Values in Statutory Interpretation, 137 U. PA. L.REV. 1007, 1065 (1989). I believe the restrained course for judges is to require a clear legislative statement as to which is dominant.
I would hold that a construction of the statutes allowing the arbitration provision to be given effect leads to the absurd result of eviscerating the nursing home code for nearly every patient intended to be protected by it. Such a construction could lead to the failure of the nursing home code to protect a single person. I would hold that the arbitration code will not be so interpreted without a clear statement by the Legislature making that result indubitable. Because the current statutes do not make that intent clear, I would simply hold in every case presenting this result that this arbitration provision is not enforceable unless the legislature clarifies the statutes to say so.
NOTES
[1] The nursing home also argues that our decision in Consolidated Resources Healthcare v. Fenelus, 853 So.2d 500 (Fla. 4th DCA 2003) requires affirmance. In Fenelus we held that the lack of a signature by the nursing home on the admission agreement did not invalidate the entire agreement including an arbitration requirement because the contract had been performed. The arguments we address in this case, which concern the validity of the arbitration clause alone, and not the entire contract, were not raised in Fenelus.
[2] We are not certifying direct conflict with Powertel, Inc. v. Bexley, 743 So.2d 570 (Fla. 1st DCA 1999), because it does not appear from the opinion in Powertel that the claimant was asserting any theory other than unconscionability. In Powertel the appellate court stated that, because the arbitration clause insulated the defendant from liability under consumer protection statutes, this was an additional reason to conclude that the arbitration provision was substantively unconscionable. Nor are we certifying direct conflict with Gainesville Health Care Center v. Weston, 857 So.2d 278 (Fla. 1st DCA 2003), because it does not appear from that opinion that the claimant was asserting any theory other than unconscionability.
[3] Three days before her final readmission to this nursing home in October 2001, Riva had purported to sign a durable power of attorney appointing her son Melvin as attorney-in-fact. Melvin did not inform the nursing home of this when, as proxy, he signed her last readmission agreement. The nursing home persuaded the trial court, however, that the power of attorney gave Melvin the authority to bind Riva to arbitration. One of the physician's notes indicated that as a result of dementia, she was unable to make health care decisions, and the other physician indicated she suffered from organic brain syndrome. Because Riva had been found by her physicians to have been incompetent because of senile dementia years earlier, and there was no evidence that her condition had changed in any way, the trial court's reliance on the power of attorney is unsupported by competent substantial evidence.
[4] See § 744.3031(1) Fla. Stat. (2004) ("The subject of the proceeding or any adult interested in the welfare of that person may apply to the court in which the proceeding is pending for the emergency appointment of a temporary guardian."); and § 744.312(1), Fla. Stat. (2004) ("the court may appoint any person who is fit and proper and qualified to act as guardian, whether related to the ward or not."); see also § 7 65.401(1)(a) ("this paragraph shall not be construed to require such appointment before a treatment decision can be made under this subsection"). [e.s.] A provider is not required to have a guardian appointed before the patient may be treated, and the provider could conditionally admit a patient subject to ratification by a later validly appointed guardian.
[5] It is not clear to me how we get from the administration of an arbitration proceeding to replacing Florida law with the NHLA's private body of rules to resolve the arbitration. I think we have packed too much meaning into administered. The standard meanings for that word are to manage, direct, oversee, dispense, and to process. They are all synonymous with doing the papenvork. The unelaborated word administered is not reasonably likely to indicate to even a competent patient or proxy that NHLA administering the arbitration shall also apply its own private rules of primary conduct in place of the Florida Statutes to decide a disputed claim. The text of this provision is simply too unclear, too susceptible to contrary interpretations, to reach that construction.
[6] See 29 CFR § 2560.503-1 (2005) (saying in pertinent part that "The claims procedures of a group health plan will be deemed to be reasonable only if ... [they] do not contain any provision for the mandatory arbitration of adverse benefit determinations, except to the extent that the plan or procedures provide that (i) The arbitration is conducted as one of the two appeals described in paragraph (c)(2) of this section and in accordance with the requirements applicable to such appeals; and (ii) The claimant is not precluded from challenging the decision under section 502(a) of the Act [Employee Retirement Income Security Act of 1974, 29 U.S.C. 1133, 1135] or other applicable law)."
[7] See e.g. Florida Convalescent Centers v. Somberg, 840 So.2d 998, 1007 (Fla.2003) (saying that the liberal construction is only "to give effect to the legislation"); Taylor Woodrow Const. Corp. v. Burke Co., 606 So.2d 1154, 1155-56 (Fla.1992) (citing remedial canon but holding that where a statutory provision is clear and not unreasonable or illogical in its operation, the court must construe the words chosen by the legislature in their plain and ordinary meaning and may not give the statute a different meaning); Ludlow v. Brinker, 403 So.2d 969 (Fla. 1981) (holding that the in forma pauperis statute, section 57.081, should be strictly construed not to authorize payment for recording judgments to create judgment lien, and rejecting dissent's contention that, as a remedial statute, it should be liberally construed); Stokes v. Liberty Mut. Ins. Co., 213 So.2d 695, 697, 700 (Fla.1968) (noting that since the statute is remedial in nature it should be construed so as to afford the remedy clearly intended, but holding that on the other hand, it should not be extended to create rights of action not within the intent of the lawmakers as reflected by the language employed when aided, if necessary, by any applicable rules of statutory construction); Farley v. Collins, 146 So.2d 366, 368 (Fla. 1962) (noting that the Dead Man's Statute should be construed liberally because it is remedial in nature but holding that the language of the Dead Man proviso should be strictly construed and limited to its narrowest application); Nolan v. Moore, 81 Fla. 594, 88 So. 601, 604-05 (1921) (holding that where a statute is remedial in character it should not be so construed as to defeat the intention of the lawmaking power in its enactment); Becker v. Amos, 105 Fla. 231, 141 So. 136, 140 (1932) (saying that remedial statutes should be construed to advance the remedy intended).
[8] See e.g. State Farm Mut. Auto. Ins. Co. v. Laforet, 658 So.2d 55, 61-62 (Fla.1995) (saying that the general rule is that a procedural or remedial statute is to operate retrospectively but refusing to apply the statute retrospectively where it is in substance a penalty); Arrow Air Inc. v. Walsh, 645 So.2d 422, 424 (Fla.1994) (noting that the statute was remedial and procedural but refusing to apply it retrospectively where vested rights would be affected); Alamo Rent-A-Car, Inc. v. Mancusi, 632 So.2d 1352 (Fla.1994) ("Procedural or remedial statutes, on the other hand, are to be applied retrospectively and are to be applied to pending cases.").
[9] See e.g., Holbein v. Rigot, 245 So.2d 57, 59 (Fla.1971) (saying that a type of statute that qualifies as a penal statute is contrasted to a remedial statute or rule of law authorizing an individual to recover for a private wrong); Atlas Properties, Inc. v. Didich, 226 So.2d 684 (Fla. 1969) (noting the old common law notion that a tort action was punitive rather than remedial); Nichols v. Bodenwein, 107 Fla. 25, 146 So. 86, 92 (1933) ("the statute was neither remedial nor penal"); Cook v. J.I. Case Plow Works Co., 85 Fla. 421, 96 So. 292 (1923) ("The statute is neither remedial nor penal . . ."); Atlantic Coast Line R. Co. v. State, 73 Fla. 609, 74 So. 595 (1917) (noting that whether a statute is penal in the strict and primary sense, a test is whether the injur-y sought to be redressed affects the public; if redress is remedial to an individual and public is indirectly affected thereby, statute is not regarded as solely and strictly penal in nature) (quoting from State v. Atlantic Coast Line R. Co., 56 Fla. 617, 47 So. 969, 980 (1908)); see also DeBock v. State, 512 So.2d 164 (Fla.1987) ("We note in passing that many remedial statutes, designed to benefit or protect the public, have 'penal' aspects; this does not alter their basic purpose and transform them into penal measures.").
[10] See Cass R. Sunstein, Interpreting Statutes In The Regulatory State, 103 HARV. L.REV. 405, 451, 452 ("Almost no one has had a favorable word to say about the canons in many years. For the most part the canons are treated as anachronisms"); Blake A. Watson, Liberal Construction Of CERCLA Under The Remedial Purpose Canon: Have The Lower Courts Taken A Good Thing Too Far?, 20 HARV. ENVTL. L.REV. 199, 236 (1996) ("as in the case of obscenity, a precise definition of the term `remedial' has proved impossible.").
[11] Karl N. Llewellyn, Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are To Be Construed, 3 VAND. L.REV. 395, 401 (1950).
[12] See Director v. Newport News Shipbuilding & Dry Dock Co., 514 U.S. 122, 135-36, 115 S.Ct. 1278, 131 L.Ed.2d 160 (1995) ("[T]he Director retreats to that last redoubt of losing causes, the proposition that the statute at hand should be liberally construed to achieve its purposes."); Antonin Scalia, Assorted Canards of Contemporary Legal Analysis, 40 CASE W. RES. L.REV. 581, 583-84 (1989-1990) ("[The remedial canon] is surely among the prime examples of lego-babble."); Ober United Travel Agency, Inc. v. United States Dept. of Labor, 135 F.3d 822, 825 (D.C.Cir.1998) (noting that any statute may be thought remedial); East Bay Mun. Util. Dist. v. U.S. Dept. of Commerce, 142 F.3d 479, 484 (D.C.Cir.1998) (noting that "virtually all statutes are remedial in some respect"); In re Erickson, 815 F.2d 1090, 1094 (7th Cir.1987) (liberal construction "tells us the direction to move but does not help us figure out how far to go ... Finding the meaning of a statute is more like calculating a vector (with direction and length) than it is like identifying which way the underlying `values' or `purposes' point (which has direction alone)."); Mercado v. Calumet Fed. Sav. & Loan Ass'n, 763 F.2d 269, 271 (7th Cir.1985) ("But the objective of a statute is not a warrant to disregard the terms of the statute. Congress always has some objective in view when it legislates, and it is always possible to move a little farther in the direction of that objective. The fact that Congress has pointed in a particular direction does not authorize a court to march in that direction without limit. The language and structure of the statute establish how far to go.").
[13] See e.g. Mansell v. Mansell, 490 U.S. 581, 109 S.Ct. 2023, 104 L.Ed.2d 675 (1989) (invocation of statute's remedial purposes of little interpretive assistance, because Congress was concerned plural interests); U.S. v. Plaza Health Labs. Inc., 3 F.3d 643, 647 (2d Cir.1993) (acknowledging that "[t]he broad remedial purpose" of the Clean Water Act but issue not resolved by reference to its purpose).
[14] Roe v. Amica Mut. Ins. Co., 533 So.2d 279 (Fla.1988); Miele v. Prudential-Bache Sec., 656 So.2d 470 (Fla.1995) (arbitration is favored); Turnberry Assoc. v. Service Station Aid, Inc., 651 So.2d 1173 (Fla.1995) (arbitration agreements are favored and parties may waive right to have judge determine entitlement and amount of attorneys fees).
[15] The judicial attitude that arbitration agreements attempted to oust courts of lawful jurisdiction was long-lasting. Duval County v. Charleston Engineering & Contracting Co., 101 Fla. 341, 134 So. 509 (1931); Fenster v. Makovsky, 67 So.2d 427 (1953); Flaherty v. Metal Products Corp., 83 So.2d 9 (Fla.1955). The purpose of both the current statutes is now generally understood to mean that arbitration is "favored" only in the sense that arbitration agreements should be placed on the same footing as any lawful contract. See Doctor's Assoc. Inc. v. Casarotto, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) ("Courts may not ... invalidate arbitration agreements under state laws applicable only to arbitration provisions."); Scherk v. Alberto-Culver Co., 417 U.S. 506, 510-11, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) (USAA places arbitration on "same footing as other contracts").
[16] "Increasingly, nursing homes are the place of terminal care and site of death for Americans dying of chronic illnesses. [FN3] Between 1989 and 1997, nursing homes became the final place of care for increasing numbers of older Americans. In 1989, 18.6% of persons who died of non-traumatic causes died in a nursing home. This increased to 24.1% in 1997. States such as Minnesota, Nebraska, Wisconsin, South Dakota, Washington, and Rhode Island in 1997 had more than one in three persons dying in a nursing home. By 2020, Brock and Foley estimate that 40% of deaths will occur in a nursing home. [FN4] This change in demographics emphasizes the need to apply appropriate quality indicators for nursing home care for this population."

[FN3] Teno, Facts on Dying: Brown Atlas Site of Death 1989-1997 (2000). (http://www.chcr. brown.edu/dying/fact sondying.html).
[FN4] Brock DB, Foley DJ Demography and epidemiology of dying in the U.S. with emphasis on deaths of older persons. Hosp J.1998;13:49-60.
American Geriatrics Society Position Statement, Measuring Quality of Care for Nursing Home ResidentsConsidering Unintended Consequences (Nov.2002) (www. american-geriatrics. org/products/positionpapers/ unintendedconseq. shtml).
[17] See Extendicare Health Serv. Inc. v. Estate of Patterson, 898 So.2d 989 (Fla. 5th DCA 2005) (not NHLA arbitration provision); Germann v. Age Institute of Fla. Inc., ___ So.2d ___, 30 Fla. L. Weekly D383, 2005 WL 292348 (Fla. 2d DCA Feb. 9, 2005) (not NHLA arbitration provision); Rollins, Inc. v. Lighthouse Bay Holdings Ltd., 898 So.2d 86 (Fla. 2d DCA 2005) (decision vacated on rehearing); Tandem Health Care of St. Petersburg, 897 So.2d 531 (Fla. 2d DCA 2005) (issue of validity of arbitration agreement required evidentiary hearing); Estate of Etting v. Regents Park at Aventura, Inc., 891 So.2d 558 (Fla. 3d DCA 2004) (arbitration agreement not rendered invalid because resident was blind when she signed agreement without coercion or being prevented from knowing contents); Five Points Health Care Ltd. v. Alberts, 867 So.2d 520 (Fla. 1st DCA 2004) (not NHLA arbitration provision); Algayer v. Health Ctr. of Panama City Inc., 866 So.2d 75 (Fla. 1st DCA 2003) (order compelling arbitration reversed); Gainesville Health Care Center Inc. v. Weston, 857 So.2d 278 (Fla. 1st DCA 2003) (NHLA arbitration provision).
[18] See State v. Atkinson, 831 So.2d 172, 172 (Fla.2002) ("A basic tenet of statutory construction compels a court to interpret a statute so as to avoid a construction that would result in ... absurd consequences."); McKibben v. Mallory, 293 So.2d 48, 51 (Fla.1974) ("Construction of a statute which would lead to an absurd result should be avoided."); City of St. Petersburg v. Siebold, 48 So.2d 291, 294 (Fla.1950) ("The courts will not ascribe to the Legislature an intent to create absurd ... consequences, and so an interpretation avoiding absurdity is always preferred."); Haworth v. Chapman, 113 Fla. 591, 152 So. 663, 665 (1934) ("There is a strong presumption against absurdity in a statutory provision; it being unreasonable to suppose that the Legislature intended their own stultification, so, when the language used is susceptible of two senses, the sense will be adopted which will not lead to absurd consequences.").
[19] See Holly v. Auld, 450 So.2d 217, 219 (Fla.1984) ("[C]ourts of this state are without power to construe an unambiguous statute in a way which would extend, modify, or limit, its express terms or its reasonable and obvious implications. To do so would be an abrogation of legislative power. It is also true that a literal interpretation of the language of a statute need not be given when to do so would lead to an unreasonable or ridiculous conclusion. Such a departure from the letter of the statute, however, `is sanctioned by the courts only when there are cogent reasons for believing that the letter [of the law] does not accurately disclose the [legislative] intent.'" [c.o.]); State ex rel. Hanbury v. Tunnicliffe, 98 Fla. 731, 124 So. 279, 281 (1929) ("It is true there are cases in which it has been held that the letter of a statute must yield to a contrary legislative intent obviously appearing from the statute when considered as a whole or in pari materia with other statutes. Such cases are few and exceptional. Such a construction is sanctioned by the courts only when there are cogent reasons for believing that the letter does not accurately disclose the intent." [c.o.]).
[20] See Pierce v. Isaac, 134 Fla. 666, 184 So. 509, 513 (1938) ("The general rule is that competent parties shall have the utmost liberty of contracting and their agreements voluntarily and fairly made will be upheld and sustained by the courts. All parties sui juris are free to make whatever contract they may choose so long as no fraud or deception is practiced and there is no infraction of law. The fact that one of the parties to a contract made a hard bargain will not alone avoid a contract.").
[21] Id.; see also Beach Resort Hotel Corp. v. Wieder, 79 So.2d 659, 663 (1955) ("It is well settled that courts may not rewrite a contract or interfere with the freedom of contract or substitute their judgment for that of the parties thereto in order to relieve one of the parties from the apparent hardship of an improvident bargain.").